UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

MIRIAM MORALES,

          Plaintiff,

  - against -

MICHAEL J. ASTRUE, Commisioner of
Social Security,

          Defendant.
------------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

**OPINION AND ORDER**

**11 Civ. 1853 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/9/12

## I.   INTRODUCTION

Miriam Morales ("Morales") brings this action pursuant to the Social Security Act (the "Act"),[1] seeking judicial review of a final decision by the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB").  Plaintiff has moved, and the Commissioner has cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  Morales requests a finding that she is entitled to disability benefits or, in the alternative, remand of the case for further proceedings.

---

[1]    *See* 42 U.S.C. § 405(g).

For the following reasons, plaintiff's motion is granted and her case is remanded to the Commissioner for further administrative proceedings.

## II.    FACTUAL BACKGROUND

### A.    Procedural History

The evidence, which is contained in the administrative record, has been summarized by the Administrative Law Judge ("ALJ") in his decision denying benefits.[2]  I will recount only those facts pertinent to these motions. Plaintiff filed her claim for DIB on August 30, 2008, at which time she alleged that she was disabled due to a back impairment.  On November 28, 2008, her claim was denied on initial administrative review.  Morales then requested a hearing and appeared, with counsel, for a video hearing before ALJ Barry Peffley ("ALJ Peffley") on March 15, 2010.   On  March 19, 2010, ALJ Peffley issued a decision finding that Morales was not disabled under the Act and denied her claim for DIB. Morales sought Appeals Council review.  On February 4, 2011, her request for review was denied and the ALJ's decision became final.

### B.    The Administrative Record

The administrative record consists of non-medical evidence, medical evidence, and vocational expert testimony from the March 15, 2010 video hearing.

_____

[2]      *See* Transcript of the Administrative Record ("Tr."), filed as part of the Commissioner's Answer pursuant to 42 U.S.C. § 405(g).

1.      **Non-Medical Evidence**

Morales, who is now forty-six years old, was forty-three years old

when she stopped working, due to her claimed disability, in April 2008.[3]  Plaintiff

is a high school graduate, and attended community college for less than a year.

She currently lives with her twenty-five year old daughter, upon whom she relies

to take care of her.[4]  Plaintiff states that her disability began when she fell into an

open manhole, injuring herself.[5]  Morales was laid off in 2008 because she missed

too many day of work due to arm and back pain.[6]  Prior to being laid off, Morales

assisted the director of a ballet school from 2001 through 2008.  Her duties

included walking the children to class and general office work.  Her time was

evenly distributed between sitting and standing/walking.[7]  Her job required her to

lift and carry objects weighing five pounds or less.[8]  Before her position at the

ballet school, Morales worked part-time for the company "Client Associates" from

---

[3]      *See* Tr. at 27.

[4]      *See id.*

[5]      *See id.* at 36.

[6]      *See id.* at 28.

[7]      *See id.* at 29-30.

[8]      *See id.* at 30.

1997 to 2001.[9]  There, she answered telephones and handled other light clerical

tasks.[10]  Prior to her position with "Client Associates," Morales worked in a real

estate office for eight years, again performing light clerical tasks and answering

phones.[11]

Morales testified that she had pain in both of her arms, although her

right arm was worse.  Further, she stated that she has difficulty moving her arms

forward, to the side, and above her head.   Morales complained of "pinched

nerves" in her neck which "affects everything, me looking sideways, it affects me

picking up a bag, sometimes I drop whatever I have in my hand."[12]  Morales also

described her pack pain and how it interfered with her work.  She testified that she

receives epidural injections every four months, which provides only minimal

relief.[13]  Morales also testified that due to the pain, she is unable to bend at all or

kneel down.  Morales further testified that her "sharp" lower back pain radiates to

both legs, which also results in leg numbness and tingling.[14]  Additionally, Morales

---

[9]    *See id.* at 31.

[10]    *See id.*

[11]    *See id*. at 32.

[12]    *Id*. at 36.

[13]    *See id.* at 29.

[14]    *See id*.

testified that due to her disability, she was limited to sitting for only fifteen-to-twenty minute stretches, standing for fifteen minutes, walking three to four blocks, and lifting less than five pounds.[15]  Plaintiff also alleged that she was on pain medication which caused headaches and made her drowsy, nauseous, and unable to concentrate.[16]

### 2.    Medical Evidence

#### a.    Relevant Evidence Prior to Plaintiff's Alleged Onset of Disability on April 21, 2008

On June 14, 2005, plaintiff was sent for a magnetic resonance imaging ("MRI") of the lumbar spine which showed degenerative disease at the L5-S1 disc, and minimal impingement at L2-3, and mild to moderate impingement of the L5 nerve root.[17]  On May 14, 2006, Morales received an epidural steroid injection for her back pain, which provided some relief.  On May 16, 2006, Morales was examined by Dr. Elizabeth Lachmann for her back pain.[18]  She was then re-examined on September 19, 2006, and underwent another MRI on September 21, 2006.  This MRI revealed a central disk herniation at the L5-S1 level and

---

[15]        *See id.* at 34-35.

[16]        *See id*. at 32, 39.

[17]        *See id*. at 240.

[18]        *See id*. at 238.

significant compression of the thecal sac and S1 nerve roots.[19]  Further, the MRI

showed a disc herniation at the L3-L4 level without significant compression or

stenosis.  On the same day that plaintiff underwent her MRI, she was also

examined by Dr. Shakil Ahmed.[20]  Dr. Ahmed noted that Morales complained of

acute exacerbation of back pain, but that plaintiff's motor strength was 5/5 for both

her upper and lower extremities.[21]  He recommended a Lumbar Epidural Steroid

Injection ("LESI"), which was performed on September 25, 2006.[22]  Dr. Ahmed

noted that the patient reported a reduction of lower extremity pain from 8/10 to

5/10 post injection.  On October 20, 2006, Dr. Ahmed performed a follow-up

examination, noting that although pain intensity had improved by 75%, the pain

pattern remained the same– radiation to posterior thighs, calves, and ankles.[23]

---

[19]     *See id.* at 211-212.

[20]     *See id.* at 226, 228-230.

[21]     *See id.* at 229.

[22]     *See id.* at 229, 231-232.

[23]     *See id.* at 229.

Morales was diagnosed with lumbar radiculopathy[24] and lumbar disc

displacement.[25]

       **b.**    **Relevant Medical Evidence from April 21, 2008 Through the ALJ's Decision on March 19, 2010**

       **i.**    **Treating Physicians**

       **a)**    **Dr. Lachmann**

Morales began seeing Dr. Lachmann again on June 10, 2008, nearly

two years after her previous visit.  She was diagnosed with sciatica,[26] disc

displacement, and cervical radiculitis.[27]  Dr. Lachmann did not find evidence of

muscle spasm or atrophy, and plaintiff's range of motion was within functional

---

[24]     "Radiculopathy" is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary,* 1404 (28th ed. 1994).

[25]     *See* Tr. at 227.

[26]     "Sciatica is a symptom of a problem with the sciatic nerve, a large nerve that runs from the lower back down the back of each leg. It controls muscles in the back of your knee and lower leg and provides feeling to the back of your thigh, part of your lower leg and the sole of your foot.  When you have sciatica, you have pain, weakness, numbness or tingling. It can start in the lower back and extend down your leg to your calf, foot, or even your toes." *See* Medline Plus, U.S. National Library of Medicine, National Institutes of Health, U.S. Department of Health and Human Services, available at http://www.nlm.nih.gov/medlineplus/sciatica.html.

[27]     "Radiculitis" refers to "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." *Dorland's* at 1404.

limits.[28]  Dr. Lachmann prescribed the following treatments: body mechanics,

moist heat, ice, electrical stimulation, massage, therapeutic exercises, strengthening

exercises, stretching exercises, abdominal and gluteal sets and home exercises.[29]

On June 16, 2008, Morales underwent an MRI of the lumbar spine.[30]  The MRI

showed an annular bulge with right lateral recess and foraminal disc herniation at

the L4-5 level with no significant compression or stenosis; annular bulge with

minimal left paracentral disc herniation at the L3-4 level; and small left foraminal

disc profusion at the L2-3 level.[31]   Dr. Lachmann performed an electromyogram

("EMG") on Morales on June 18, 2008.[32]   The testing revealed S1 radiculitis.

Morales returned to Dr. Lachmann on July 9, 2009, for ongoing pain.  The

physician's notes indicate that Morales was taking Percocet and Oxycontin, but

that they were not working and were causing headaches.[33]  Following this

evaluation, Dr. Lachmann wrote a note on a prescription pad indicating that

plaintiff's diagnosis was "lumbar disc displacement/sciatica," and wrote that

---

[28]     *See* Tr. at 223.

[29]     *See id.* at 259.

[30]     *See id.* at 217-218.

[31]     *See id.* at 316-317.

[32]     *See id.* at 213-216.

[33]     *See id.* at 311.

Morales was "unable to work" for one year.[34]  Dr. Lachmann next saw Morales one year later, on July 27, 2009, for an EMG and nerve conduction testing.[35]  The report stated that Morales had cervical radiculitis, but there was no focal neuropathy, including no carpal tunnel syndrome and no ulnar neuropathy.[36]  On July 30, 2009, Morales received an MRI of the cervical spine, which revealed a small central disc bulge at C3-C4; a disc ridge complex at C4-C5 with minimal left foraminal stenosis;[37] right lateral recess and foraminal disc-osteophyte at C5-C6 with probable soft disc component and right lateral recess and foraminal stenosis; and moderate to severe right and moderate left foraminal stenosis at C6-C7.[38]

### b)    Dr. Shakil Ahmed

Morales returned to Dr. Ahmed on June 18, 2008, roughly two years since her last visit.[39]  Dr. Ahmed examined Morales eleven times between June

---

[34]     *Id.* at 310.

[35]     *See id*. at 430-433.

[36]     *See id.*

[37]     "Stenosis" refers to the "narrowing or stricture of a duct or canal." In the spine, such narrowing is "caused by encroachment of bone upon the space." *Dorland's* at 1576.

[38]     *See* Tr. at 427-428.

[39]     *See id*. at 277-279.

-9-

2008 and June 2009.[40]  Dr. Ahmed noted that "recently [Morales] has noticed an

acute increase in similar pain. Pain is 10/10, constant, sharp present in lower back

with radiation to bilateral posterior thighs, posterior calves up to ankles and into

the soles of her feet.  Pain is aggravated by all activity and improved minimally

with rest."[41]  Over the next year, Dr. Ahmed administered LESIs in June and

December 2008, and three times in 2009.[42]  He noted that these injections provided

only minimal pain relief.  Dr. Ahmed consistently observed that plaintiff appeared

to be in no visible distress, presented complaints of moderate lumbar paravertebral

tenderness, and positive straight leg raising.  Further, he noted that Morales had

normal heel/toe walking and a normal gait.[43]  On December 30, 2008, Dr. Ahmed

examined Morales and she underwent an MRI scan of the lumbar spine.[44]  The

results indicated that there was stable endplate osteophyte causing moderate

bilateral foraminal narrowing at L5-S1 and a minimal stable disc bulge at L4-5;

there was no sign of significant compression of the spinal cord or of canal

---

[40]     See, e.g., id. at 243, 277-279, 280-285, 296-297, 354-358, 372-380,
382-384, 386-388.

[41]     Id. at 277.

[42]     See id. at 243, 280-281, 296-297, 354, 376, 385, 389-390, 603-504,
509.

[43]     "Gait" refers to the "manner or style of walking." Dorland's at 671.

[44]     See Tr. at 325-326.

-10-

stenosis.[45]  Dr. Ahmed's notes from December 30, 2008 indicate that her sharp

shooting pains remained unchanged, and that she now reported frequently tripping

because her right foot gets stuck on things.[46]  Dr. Ahmed regularly prescribed, or

noted that other treating sources had prescribed, pain medication including

Oxycontin and Percocet.  Further, Dr. Ahmed noted that Morales took Oxycontin

at bedtime because it made her sleepy.[47]

### c)      Dr. Imelda Cruz-Banting

On December 16, 2008, Morales met with Dr. Cruz-Banting for an

initial consultation.[48]  Morales saw Dr. Cruz-Banting three additional times through

July 2009.[49]  Dr. Cruz-Banting diagnosed Morales with chronic back pain and

degenerative disc disease with radiculopathy, as confirmed by MRI.[50]   The

examinations also showed positive straight leg raising and moderate muscle

---

[45]      *See id.* at 445.

[46]      *See id.* at 378.

[47]      *See id.* at 354.

[48]      *See id.* at 396.

[49]      *See id.* at 396-398, 399-408.  Plaintiff contends that she saw Dr. Cruz-Banting twenty times during the seven months of treatment.  However, the record indicates that this number includes Morales's many visits to physical therapy, which is located in the same facility where Dr. Cruz-Banting practices.

[50]      *See id*. at 334-335.

spasm.[51] Dr. Cruz-Banting noted no muscle atrophy, no loss of motion for the

upper or lower extremities and normal gait, although there were complaints of pain

when Morales walked on her heels.[52]  Additionally, Morales sought physical

therapy at Dr. Cruz-Banting's office from December 2008 through August 2009.[53]

Dr. Cruz-Banting completed a Multiple Impairment Questionnaire

(the "Questionnaire") on May 20, 2009, which she updated on July 6, 2009.[54]  She

noted that Morales's condition was "guarded" and identified the clinical findings

that supported that diagnosis.  The findings included: persistent decrease in lumbar

spine range of motion; weakness of the right hip and right ankle; diminished

sensation on the bilateral L5; diminished deep tendon reflexes at the ankle and

knee; and positive straight leg raising.[55]  When asked to estimate Morales's level of

pain on a scale of one to ten, she marked a ten and noted "as per patient."[56]  She

noted Morales's fatigue level as a seven out of ten.  When asked to estimate her

residual functional capacity ("RFC"), Dr. Cruz-Banting wrote that Morales could

---

[51]     *See id.* at 396-408.

[52]     *See id.*

[53]     *See id*. at 408-410, 442.

[54]     *See id.* a 334-341.

[55]     *See id.*

[56]     *Id. at* 336.

sit for up to three hours and stand/walk for up to one hour in an eight hour work day.[57]  She determined that Morales would need to get up and move around every thirty minutes, with breaks of five to ten minutes before sitting down again.[58]  Dr. Cruz-Banting opined that Morales could carry/lift up to five pounds frequently and up to twenty pounds occasionally.[59]  Further, she reported that Morales was capable of tolerating low work stress, but that due to her back pain, Morales would likely be absent more than three times per month from work.  Lastly, Dr. Cruz-Banting opined that Morales should avoid dampness, temperature extremes, humidity and heights.[60]

### ii.     Consulting Examination - Dr. Justin Fernando

On October 17, 2008, Morales was examined by Dr. Justin Fernando, a consulting physician for the Social Security Administration (the "SSA").  Dr. Fernando determined that Morales displayed clinical evidence of radiculopathy in the lower extremities, including positive straight leg raise, diminished reflexes in the right lower extremity, and a diminished range of motion.  He found that there

---

[57]     *See id.*

[58]     *See id.*

[59]     *See id.* at 337.

[60]     *See id.* at 340.

was no evidence of muscle atrophy, she had a normal gait, and there was no spasm or tenderness in the lumbar region.  Additionally, Dr. Fernando found that Morales had full range of motion in both her cervical findings and upper extremities.[61]   In terms of daily life, Morales reported to Dr. Fernando that she showers and dresses herself daily without assistance, cooks three times per week, and does not require a cane or other assistive device to help her walk and stand.  Dr. Fernando diagnosed Morales with "1. Chronic pain in the cervical spine without radicular symptoms. 2. Chronic lower back pain with unilateral subjective lumbosacral radiculopathy."[62] Further, he found that "[t]here is no evidence of muscle atrophy, but evidence from the reflexes indicate nerve root involvement. The claimant may be limited in her capacity for prolonged physical activities that cause sustained standing, sitting, walking, bending, pushing, pulling, and all activities that requires the use of strength."[63]

### 3.    Vocational Expert Testimony

The SSA retained vocational expert ("VE") Jennifer Disone to testify

---

[61]    *See id.* at 291.

[62]    *See id.*

[63]    *See id.* at 292.

at plaintiff's hearing.[64]  The VE based her findings on plaintiff's testimony during the hearing, and upon her written submissions to the SSA.  Disone stated that Morales's past work as an office assistant was considered light work, while her work as a telephone answering service employee was considered sedentary work.[65] The ALJ asked the VE to discuss potential jobs suitable for a person of plaintiff's vocational profile which included the following limitations: "sedentary work, have a sit/stand option . . . but would not be off task more than 10 percent of the work period . . . have push and pull limited to the occasional in the left and right upper extremity, only occasional climb ramps, never climb ladders, occasionally bend. . . ."[66]  Disone stated that Morales would not be able to perform the duties as a general office clerk, as she did at the ballet school.  However, the VE identified other job opportunities plaintiff could perform, including telephone answering service work, telemarketer of which there were 345,220 positions nationally and 7,630 locally, and switchboard operator, of which there were 1,173,000 positions nationally and 38,800 locally.  Finally, Morales's attorney asked the VE whether a person would be able to perform the same hypothetical jobs if the person needed to take

---

[64]    *See id*. at 41-45.

[65]    *See id.* at 41-43.

[66]    *Id.* at 43.

unscheduled breaks of up to thirty minutes away from the work station, or if the person were absent three days or more per month.[67]  The VE answered no to both questions.

### C.    The ALJ's Decision and Analysis

At step one of his analysis, the ALJ determined that plaintiff had met the insured status requirements of the SSA through December 31, 2012, and that she had not engaged in substantial gainful activity since April 21, 2008.[68]  Next, the ALJ found that Morales had the following severe impairments, which caused more than minimal limitations to plaintiff's ability to perform work-related activities: "degenerative disc disease of the lumbar and cervical spine, herniation of L5-S1 disc; bilateral radiculopathy of the lower extremities; cervical stenosis and cervical radiculopathy (20 CFR 404.1520(c))."[69]  At step three, the ALJ determined that Morales did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.  The ALJ concluded that the requirements had not been met because there was "no evidence of nerve root compression, or spinal arachnoiditis, or lumbar spinal

---

[67]    *See id.* at 45.

[68]    *See id.* at 13.

[69]    *Id.*

-16-

stenosis resulting in pseudoclaudication."[70]

At step four, the ALJ found that plaintiff had the RFC to perform a range of sedentary work,[71] with the following limitations:

> the claimant can only occasionally push or pull with her upper extremities; must alternate between sitting and standing, at will, provided she is not off task for more than 10% of the workday; can occasionally climb ramps and stairs, and never climb ladders ropes or scaffolds; and can occasionally bend.[72]

In making this determination, the ALJ discussed the opinions of Morales's treating physicians. He discounted Dr. Lachmann's assessment that Morales would be unable to work for a year, stating that this opinion was conclusory because Dr. Lachmann did not give a function-by-function assessment of Morales's abilities.[73] The ALJ also concluded that Dr. Lachmann's finding of complete disability was a

---

[70]    *Id.*

[71]    Sedentary work is the least rigorous of the five categories of work which include "very heavy, heavy, medium, light, and sedentary." 20 C.F.R. §§404.1567. Generally, sedentary work involves "up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000). "Sedentary work also involves 'lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.'" *Id.* (quoting 20 C.F.R. § 404.1567(a)).

[72]    Tr. at 13-14.

[73]    *See id.* at 16-17.

decision reserved for the Commissioner, and that it was not supported by the record as a whole.

In analyzing step four, the ALJ also summarized the findings of Dr. Cruz-Banting.  He stated that "[a]lthough it is from a treating source, this opinion is given little weight as it is not well explained and appears to rely on the claimant's assessment of her abilities rather than objective evidence or clinical findings."[74]  The ALJ then summed up Dr. Fernando's opinion.  Although he found Dr. Fernando's statements as to Morales's limitations to be "somewhat vague . . . and a bit speculative" and "a bit confusing," he nevertheless accorded these opinion "significant weight" stating that the RFC he [the ALJ] found for Morales accorded with Dr. Fernando's opinion.[75]

The ALJ also addressed his assessment of plaintiff's subjective complaints.  He noted that while the record clearly supported a finding that Morales was in pain and sought pain relief through a variety of modalities, surgery was never proposed or sought.[76]  He therefore found that if the pain was as bad as she alleged, she would have at least discussed this option.  The ALJ determined

---

[74]    *See id.* at 16.

[75]    *See id.*

[76]    *See id.* at 15.

that Morales's complaints exceeded the opinions provided by her treating

physicians, and that she was "prone to exaggeration and may believe herself to be

more limited than she actually is."[77]   Based on his review of all the evidence, the

ALJ concluded that claimant had the RFC to perform her past relevant work.

Nonetheless, the ALJ reached step five and held that Morales had the

RFC to perform other sedentary positions in the national economy.[78]  Therefore,

the ALJ found Morales was "not disabled" as defined by the Act.[79]

## III.   LEGAL STANDARD

### A.   Substantial Evidence Standard

In reviewing an ALJ's decision in a disability benefits case, a district

court does not conduct a *de novo* review of the ALJ's decision.[80]  The ALJ must set

forth the crucial factors supporting his decision with sufficient specificity,[81] but a

district court must not disturb the ALJ's decision if "correct legal standards were

---

[77]    *Id.* at 16.

[78]    *See id.* at 18.

[79]    *Id.* at 19.

[80]    *See Petrie v. Astrue*, 412 Fed. App'x 401, 403-04 (2d Cir. 2011). *See also Brickhouse v. Astrue,* 331 Fed. App'x 875, 876 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

[81]    *See McCallum v. Commissioner of Soc. Sec.*, 104 F.3d 353 (Table) (2d Cir. 1996); *Ramos v. Barnhart,* No. 02 Civ. 3127, 2003 WL 21032012, at *6 (S.D.N.Y. May 6, 2003).

applied" and "substantial evidence supports the decision."[82]  "Substantial evidence is 'more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[83]

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."[84]  Even if there is also substantial evidence for the claimant's position, the Commissioner's decision must be affirmed when substantial evidence exists to support it.[85]  Moreover, the Commissioner's findings of fact, as well as the inferences and conclusions drawn from those findings, are conclusive even in cases

---

[82]   *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). *See also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). *Accord Halloran*, 362 F.3d at 31.

[83]   *Burgess v. Astrue,* 537 F.3d 117, 127-28 (2d Cir. 2008) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). *Accord Halloran*, 362 F.3d at 31; *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

[84]   *Tarsia v. Astrue*, 418 Fed. App'x 16, 17 (2d Cir. 2011) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

[85]   *See Davila-Marrero v. Apfel,* 4 Fed. App'x 45, 46 (2d Cir. 2001) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (quoting *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990))).  *See also Morillo v. Apfel*, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

where a reviewing court's independent analysis of the evidence might differ from the Commissioner's analysis.[86]

## B.    Five-Step Process

Pursuant to the Act, the SSA has established a five-step sequential process to determine whether a claimant is disabled.[87]  At step one, the ALJ must decide whether the claimant is engaging in substantial gainful work activity ("SGA").[88]  Generally, if the claimant has earnings from employment above a certain level, she is presumed to be able to engage in SGA and is deemed not disabled.[89]  If the claimant is not engaging in SGA, the analysis continues.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or a combination thereof, that is "severe."[90] According to the Regulations, an impairment or combination of impairments is

---

[86]      *See Hartwell v. Barnhart*, 153 Fed. App'x 42, 43 (2d Cir. 2005). Because credibility is a question of fact, the Commissioner has discretion to determine whether or not a claimant's subjective complaints are credible. *See Staubley v. Electric Boat Co.*, No. 10-3186-AG, 2011 WL 3849556, at *2 n.2 (2d Cir. Sept. 1, 2011) (citing *McLaughlin v. Secretary of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980)); *Lopez v. Astrue*, No. 08 Civ. 480, 2009 WL 790099, at *6 (S.D.N.Y. Mar. 25, 2011).

[87]      *See* 20 C.F.R. § 404.1520(a).

[88]      *See id.* § 404.1520(a)(4)(I).

[89]      *See id.* § 404.1520(b).

[90]      *Id.* §§ 404.1520(a)(4)(h), (c).

"severe" if it significantly limits the claimant's ability to perform basic work-related activities.[91]  An impairment is "not severe" when the evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.[92]  If the claimant has a severe impairment or combination thereof, the analysis must proceed.

At step three, the ALJ determines whether the claimant's impairment or combination thereof meets or medically equals the criteria of a listed impairment.[93]  If the impairment is contained in the Listings, the claimant is considered disabled.[94]  If not, the analysis continues.

Before proceeding to step four, the ALJ must first determine the claimant's RFC,[95] which is her ability to complete work-related activities on a sustained basis despite limitations from impairments.  In making this finding, the

---

[91]     *Id.* § 404.1520(c).

[92]     *Id.* § 404.1521.

[93]     *See id.* Part 404, subpart P, Appendix 1 (hereinafter the "Listings"). The Listings define impairments that prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just "substantial gainful activity." *See id.* § 404.1525(a) (the purpose of the Listings is to describe impairments "severe enough to prevent a person from doing any gainful activity, regardless of his or her age, education, or work experience.").

[94]     *See id.* § 404.1520(d).

[95]     *See id.* § 404.1520(e).

ALJ must consider all of the claimant's impairments, including any non-severe impairments.[96]  At step four, the ALJ must determine whether the claimant has the RFC to perform any relevant work that the claimant has done in the past.[97]  If the claimant is unable to do any past relevant work, the analysis proceeds.

At the last step of the evaluation, the ALJ must determine whether the claimant's RFC, age, education and work experience allow her to perform any other work in the national economy.[98]  If so, the claimant is not disabled.  But if she is unable to do other work, the claimant is disabled.  Although the claimant generally continues to have the burden of proving disability, a limited burden of production shifts to the SSA.  To support a finding that the claimant is not disabled at this final step, the SSA must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can perform, given her RFC, age, education and work experience.[99]

_____

[96]    *See id.*

[97]    *See id.* § 404.1520(f).

[98]    *See id.* § 404.1520(g).

[99]    *See id.* §§ 404.1520(g), 404.1560(c).

C.     The "Treating Physician" Rule

Under the "treating physician" rule, "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."[100] When a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive.  These factors include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.[101]  After considering the above factors, the ALJ must "'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'"[102]  Failure to provide such "'good

---

[100]     *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  *See also* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

[101]     *See* 20 C.F.R. § 404.1527(d)(2).

[102]     *Newbury v. Astrue*, 321 Fed. App'x 16, 17 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33). *See also* 20 C.F.R. § 404.1527(d)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion").

-24-

reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."[103]

## IV.   DISCUSSION

### A.   The ALJ's Evaluation of the Medical Evidence

Morales contends that the ALJ did not follow the treating physician rule.  Plaintiff argues that the ALJ was incorrect in dismissing Dr. Lachmann's opinion that Morales was unable to work for a year.[104]  While the ultimate determination of disability is within the Commissioner's discretion, he is still required to assess the findings of a treating physician when determining the "nature and severity" of a plaintiff's impairment.  The Commissioner is further required to explain why he is rejecting the opinions of treating physician(s), in part or whole, and the weight given to such opinions.[105]  The ALJ rightfully pointed out that Dr. Lachmann failed to elaborate on how she reached her opinion.  The ALJ did not

---

[103]   *Newbury*, 321 Fed. App'x at 17.  *Accord Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reason' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

[104]   *See* Tr. at 310.

[105]   *See* 20 C.F.R. § 404.1527(d)(2).  *See also Newbury,* 321 Fed. App'x at 18 (explaining that although the ultimate finding of disability is reserved to the Commissioner, the ALJ is still obligated to explain why a treating physician's opinion is not being credited)).

abuse his discretion in rejecting Dr. Lachmann's unsupported, blanket statement of disability.

Next, Morales argues that the ALJ improperly assigned little weight to Dr. Cruz-Banting's opinion.  Dr. Cruz-Banting completed the Questionnaire reporting plaintiff's history of pain, the results of her medical tests, and her diagnoses of chronic lower back pain and cervical radiculopathy.  At the end of the Questionnaire, Dr. Cruz-Banting checked a series of boxes indicating that plaintiff was incapable of performing even sedentary work.  Morales contends that Dr. Cruz-Banting thoroughly explained the basis of her medical findings, both with clinical findings and objective diagnostic testing.

Defendant argues that the ALJ was justified in discounting Dr. Cruz-Banting's opinion, and gave sufficient reasons for doing so.  In rejecting Dr. Cruz-Banting's opinion, the ALJ provided three reasons.  *First,* the ALJ concluded that this treating physician's opinion was not "not well explained and appear[s] to rely on the claimant's assessment of her abilities rather than objective evidence or clinical findings."[106]  *Second,* the ALJ found that Dr. Cruz-Banting failed to

---

[106]     Tr. at 17.  A treating physician's opinions need not be given controlling weight when "treating physician's opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective tests." *Baladi v. Barnhart*, 33 Fed. App'x 562, 564 (2d Cir. 2002).  *Accord Lena v. Astrue*, No. 10 Civ. 893, 2012 WL 171305, at *11 (D. Conn. Jan. 20, 2012).

explain why plaintiff would need to avoid the environmental conditions discussed in the Questionnaire. *Lastly*, the ALJ noted that Dr. Cruz-Banting had only treated Morales for a short period of time when she rendered her assessment.

The ALJ's decision to disregard the opinion of Dr. Cruz-Banting with respect to plaintiff's RFC was error. *First*, the opinion of Dr. Cruz-Banting was consistent with other substantial evidence in the record. *Second*, contrary to the finding of the ALJ, Dr. Cruz-Banting did rely on clinical findings in the Questionnaire she completed in support of her opinion. These findings included: persistent decrease in lumbar spine range of motion; weakness of the right hip and right ankle; diminished sensation on the bilateral L5; diminished deep tendon reflexes at the ankle and knee; and positive straight leg raising. Additionally, all three treating physicians, in their reports and records, consistently indicated that Morales should continue her course of medication as well her physical therapy and pain management in the form of pain blocking and steroid injections. These reports, in turn, are substantiated by MRIs and other medical evidence. Further, the ALJ seems to have rejected Dr. Cruz-Banting's entire opinion because of the environmental factors she listed in the Questionnaire. The weight placed on this single reference to justify the wholesale rejection of Dr. Cruz-Banting's entire opinion was improper.

Next, contrary to the ALJ's finding, the length of Dr. Cruz-Banting's relationship with Morales is not insignificant.  Dr. Cruz-Banting had been treating Morales for nearly five months when she completed the Questionnaire on May 20, 2009, and six months when she reiterated her findings on July 6, 2009.  Within this period, Dr. Cruz-Banting examined Morales four times.  To give Dr. Cruz-Banting's opinion little weight because her relationship with Morales was "only recent and somewhat limited at the time she rendered this assessment"[107] appears disingenuous when the ALJ gave significant weight to a consulting physician who examined Morales once before rendering his assessment.

Finally, the ALJ failed to consider all of the relevant factors discussed above in his decision not to accord any weight, much less controlling weight, to the treating physicians' opinions. While the reasons advanced by the ALJ relate to the second and third factors– *i.e.*, the evidence in support of the opinions and the consistency of the opinions with the record as a whole – the first and fourth factors were apparently not considered at all.[108]  For instance, the ALJ did not mention the specialties of the three treating physicians'.  For these reasons, the ALJ erred in discounting the treating physicians opinions.

---

[107]   Tr. at 17.

[108]   *See supra* Part III.C. at 24.

**B.      Sufficiency of the ALJ's Residual Functional Capacity Finding**

Next, Morales argues that the ALJ erred in failing to do a function-by-function analysis of her ability to sit, stand, walk, lift, carry, push and pull.  While the Second Circuit has not specifically addressed the requirement of a function-by-function assessment,[109] other circuits have held that while a function-by-function analysis is desirable, the ALJ's written opinion need not discuss each function, especially those functions for which no limitation is alleged.[110]  Within the Southern District of New York, courts have reached different conclusions as to whether a function-by-function analysis is required or merely desirable.[111]

Here, in making his RFC determination, the ALJ chose to address

---

[109]     *See Wood v. Commissioner of Soc. Sec.*, No. 06 Civ. 157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009).

[110]     *See Delgado v. Commissioner of Soc. Sec.*, 30 Fed. App'x 542, 547-48 (6th Cir. 2002); *Bencivengo v. Commissioner of Soc. Sec.*, 251 F.3d 153 (Table) (3d Cir. 2000).

[111]     *Compare, Novak v. Astrue*, No. 07 Civ. 8435, 2008 WL 2882638, at *3 (S.D.N.Y. July 25, 2008) ("Although the Second Circuit has not specifically addressed this question, several courts . . . have held that the function-by-function requirement of SSR 96-8p does not apply to the A.L.J.") and *Casino-Ortiz v. Astrue*, No. 06 Civ. 155, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) ("'Although a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce [ ] a detailed statement in writing.'") (quoting *Burrows v. Barnhart*, No. 03 Civ. 342, 2007 WL 708627, at *13 (D. Conn. Feb. 20, 2007) (quotation marks and citations omitted)) *with Murphy v. Barnhart*, No. 00 Civ. 9621, 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) ("Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis.").

*some* but not all of Morales' ability to perform certain functions.  The ALJ noted that "claimant can only occasionally push or pull with her upper extremities; must alternate between sitting and standing, at will, provided she is not off task more than 10% of the workday; can occasionally climb ramps and stairs, and never climb ladders ropes or scaffolds; and can occasionally bend."[112]  However, the ALJ chose *not* to address how long Morales could sit or stand and how much she could lift, carry, push or pull.  The ALJ cannot have it both ways.  He criticized Dr. Lachmann for not taking a function-by-function approach and then he went halfway in that direction but not all the way.  He used the word "occasionally" three times (with respect to pushing and pulling, climbing ramps or stairs and bending), but never assessed whether she had the ability to sit for six hours or stand/walk for two hours per eight-hour workday[113] or whether she had any ability to lift articles such as docket files, ledgers, or small tools.[114]  Nor did the ALJ ever explain how he arrived at his conclusion that claimant had the RFC to perform sedentary work, particularly given Dr. Cruz-Banting's assessment that Morales could only sit for up to three hours and stand/walk for up to one hour in an eight-

---

[112] Tr. at 14.

[113] *See Curry,* 209 F.3d at 122 (defining the criteria for sedentary work to include six hours of sitting and two hours of standing/walking).

[114] *See id.* (quoting 20 C.F.R. § 404.1567(a).

hour workday.[115]

In making his RFC finding, the ALJ appears to have worked backwards, first determining Morales's RFC, and then supporting his decision by relying principally on Dr. Fernando's consulting report.  Dr. Fernando opined that the claimant "may be limited in her capacity for prolonged physical activities that cause sustained standing, sitting, walking, bending, pushing, pulling, and all activities that require the use of strength."[116]   Despite finding this assessment to be "vague," "speculative" and "confusing", the ALJ gave this opinion "significant weight."[117]  But, interestingly, Dr. Fernando's allegedly vague and confusing opinion does not support the ALJ's exertional determination.  Indeed, Dr. Fernando never gave an opinion as to how long Morales could sit or stand or how much she could lift.  Because the ALJ's RFC determination is not supported by substantial evidence, that issue must be remanded for further consideration.

### C.   Sufficiency of the ALJ's Evaluation of Morales's Credibility

Morales argues that the ALJ erred in evaluating her credibility.  An ALJ is permitted to consider an individual's activity level in making a

---

[115]     *See* Tr. at 336.

[116]     *Id.* at 292.

[117]     *Id.* at 16.

determination of credibility.  The ALJ will consider "all of the medical and non-medical information in determining credibility."[118]

The ALJ considered plaintiff's ability to cook up to three times a week, shower, groom and dress herself, as well as her testimony on the extent of her impairments.[119]  In identifying the basis for his finding on credibility, the ALJ stated that while there is evidence of impairment and limitations, "[i]t does not however, support the full extent of the claimant's allegations."[120]  The ALJ noted that although Morales claimed that she had serious difficulty standing and walking, she did not use any assistive devices such as a cane or walker.[121]  Additionally, the ALJ pointed out that Morales was steadily employed during 2006-2007, where there was objective evidence that her lumbar problem was at its worst.[122]  Finally,

---

[118]    20 C.F.R. § 404.1529(c)(3)(I). *See also Rosado v. Shalala*, 868 F. Supp. 471, 472-73 (E.D.N.Y. 1994) (an ALJ may rely on a claimant's activities of daily living as substantial evidence in support of his determination).

[119]    *See* Tr. at 17-18.  Although the ALJ believed that these activities cast doubt on Morales' credibility because dressing oneself involves bending, kneeling or squatting (which Morales claims she cannot do), plaintiff's ability to conduct these minimal daily activities does not indicate that she is capable of sedentary work or contradict the determination made by plaintiff's treating physicians.

[120]    *Id.* at 14.

[121]    *See id.* at 16.

[122]    *See id.* at 15.

the ALJ determined that Morales was not fully credible because had she been in the extreme pain she was alleging, surgery would have been discussed at some point with at least one of her many doctors.[123]

The ALJ's overall determination on credibility is entitled to deference by this Court.  Because the ALJ sufficiently set forth his grounds for concluding that  Morales's complaints were not fully credible, and this finding was not unreasonable, it must be accepted by the Court.

## V.    CONCLUSION

After carefully examining the administrative record, I conclude that the Commissioner's findings were not supported by substantial evidence in two respects: (1) an inadequate explanation for not giving the treating physician' opinions controlling weight; and (2) an insufficient explanation of his determination of plaintiff's RFC.  Accordingly, the Court hereby vacates the Commissioner's decision and remands the matter pursuant to Sentence Four of section 405(g) for further administrative proceedings.  Accordingly, plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-

---

[123]    *See id.* Also, it should be noted that the ALJ stated that he discounted claimant's allegations that her medications made her sleepy because she had never mentioned it to any of her doctors.  However, this complaint seems to have been discussed with Dr. Ahmed on March 18, 2009, where his notes indicate that Morales continued to take Oxycontin at bedtime because it made her sleepy.  See id. at 386.

motion for judgment on the pleadings is granted and the Commissioner's cross-

motion is denied.  The Clerk of the Court is directed to close these motions

[Docket Nos. 9 &13] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 9, 2012

-34-

**-Appearances-**

**For Plaintiff:**

Charles E. Binder, Esq.
Binder and Binder P.C.
60 East 42nd Street, Suite 520
New York, NY 10165
(212) 677-6801


**For Defendant:**

John E. Gura, Jr.
Assistant United States Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2712